UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CONNY TEJADA,

     Plaintiff,

v.                                                          CASE NO. 8:20-cv-1071-T-23AAS

SAMUEL RAMZI BOUTROS, et al.,

     Defendants.

_____/

## ORDER

    Conny Tejada asserts claims related to her employment and to her rental of a residence from the defendants.  She asserts claims under the Fair Housing Act of 1968, 42 U.S.C. § 3601 (FHA), the Fair Labor Standards Act, 29 U.S.C. § 201 (FLSA), state law, and a county ordinance.  After Tejada amends (Doc. 51) the amended complaint, the defendants move (Doc. 52) to dismiss several claims, and Tejada responds (Doc. 54).

## BACKGROUND

    Tejada alleges the following facts, which, on a motion to dismiss, are considered as true and are construed in the light most favorable to Tejada.  In May 2019, Tejada signed an agreement with RAB Land Properties, LLC, to rent an apartment in St. Petersburg, Florida.  Tejada alleges that "the rental property belonged to [ ] or was operated by the defendants, including . . . RAB Land

Properties and Samuel Boutros," and she alleges that the "Corporate Defendants' operations are so intertwined . . . that they act as a single entity." (Doc. 51 at 8–9)

In December 2019, after Tejada encountered financial difficulties that affected her ability to pay rent, she contacted Boutros "to inform him that she was $100 short of her rent payment, but that she would pay the full amount by December 6, 2019." (Doc. 51 at 9)  Although Boutros assured Tejada that her payment delinquency "was not a problem" and he accepted payment without charging a late fee, Tejada contacted Boutros in January 2020 to inform him that she could no longer afford her apartment in light of her financial difficulties.  (Doc. 51 at 9)  In her conversation with Boutros, Tejada "expressed that she was afraid of having an eviction action on her record if she failed to meet her obligation to pay rent." (Doc. 51 at 9)  In light of her fear, Tejada explained that she would willingly vacate the unit by February 1, 2020, and "she begged Boutros to allow her to pay whatever outstanding amounts were due to him over time rather than filing an eviction action." (Doc. 51 at 9)

Boutros agreed to market the unit for rent by February or March if the plaintiff paid the January and February rent, and Tejada "voluntarily vacated the premises so that the defendants could make the unit available for rent and thus offset any rent unpaid." (Doc. 51 at 10)  However, the plaintiff struggled to pay rent during February.  Accordingly, Boutros proposed that Tejada work for his companies by "showing properties for lease on behalf of his companies," the corporate defendants, to pay her debt.  (Doc. 51 at 10)

Further, Boutros asked Tejada "how much she would like to be paid, and she requested eighteen dollars per hour." (Doc. 51 at 10)  In response, Boutros offered Tejada twenty-five dollars per hour if Tejada agreed to work without wearing clothes.  Although Tejada initially thought that Boutros was joking, when she arrived to work for Boutros on March 4, 2020, Boutros was naked.  Boutros explained that "he and his family recently had become nudists and he would be more comfortable if [Tejada] was also naked." (Doc. 51 at 10)  Boutros subsequently asked Tejada to disrobe.  Tejada initially refused, "but Boutros continued to coerce her," and she eventually complied with Boutros's suggestion to "at least take her top off." (Doc. 51 at 11)  Video cameras in the defendants' office recorded this episode and "Boutros maintains those video recordings." (Doc. 51 at 11)

Later that evening, "Boutros texted [Tejada] asking for nude photographs," which Tejada refused to send. (Doc. 51 at 11)  Boutros renewed his request for nude photographs the following morning before Tejada arrived to work, but Tejada again refused.  A few hours later, "Boutros again began badgering [Tejada] for nude photographs, despite [her] repeated refusals and assertions that she wanted to maintain a business relationship."[1] (Doc. 51 at 11)  Nevertheless, when Tejada arrived to work, "Boutros was again naked, again asked [Tejada] to disrobe, and again [Tejada] took her top off." (Doc. 51 at 12)  As Tejada was leaving work later

---

[1] The amended complaint is not entirely clear about whether Tejada sent naked photographs to Boutros. Although Tejada alleges that she denied each request in her narration of the events, she claims in Count VIII that Boutros "coerced Tejada into providing him with nude images of herself despite her protestations and objections" and that he retains the images. (Doc. 51 at 24)

that evening, "Boutros asked [Tejada] for oral sex in extremely graphic terms and expressed that her breasts 'are amazing.'" (Doc. 51 at 12)  Tejada refused Boutros's advances.

After midnight on Friday, March 6, 2020, Boutros sent Tejada a text message "in horrifically graphic terms stating how aroused he had become by [Tejada]'s breasts and how he pictured her providing him with oral sex." (Doc. 51 at 12)  After Boutros and Tejada agreed on the time Tejada would arrive to work on March 6, Boutros messaged Tejada "not to come to work because he was 'horny' . . . , implying that he would not be able to control himself sexually if she came to work." (Doc. 51 at 12)  After Tejada refused Boutros's text-message requests for oral sex on Thursday and Friday, Boutros asked Tejada to decide "how she wished 'to proceed' because[,] if he assume[d] she intended to 'default' on her rent payments," he would initiate an eviction action.  (Doc. 51 at 12)  After Tejada questioned Boutros's threat, Boutros expressed that he remained "'willing to work' with her, but it was up to her how to proceed." (Doc. 51 at 13)  Boutros continued pressuring Tejada to perform oral sex and he promised to allow Tejada to return to work on Monday "if she provided him with oral sex that day." (Doc. 51 at 13)  "[E]motionally distraught and fear[ing] for her physical safety," Tejada did not return to work, and she never received payment for any hour she worked for the defendants.

Tejada describes Boutros's conduct during her tenancy and employment as "sexually harassing" and "discriminatory" because Boutros provided different terms for repaying rent than similarly situated male tenants and because "Boutros used

[her] expressed fear of an eviction action as a threat to extort and achieve his sexual goals." (Doc. 51 at 13)  In sum, Tejada alleges that the defendants intentionally abused their positions of trust as landlord and employer "by engaging in an ongoing course of conduct in which Boutros . . . threatened, coerced, intimidated, sexually harassed, and extorted" her.  (Doc. 51 at 13)

Count I alleges that Boutros and RAB Land Properties, LLC, violated the Fair Housing Act of 1968.  Tejada asserts that "by providing different terms and conditions in the rental," Boutros and RAB Land Properties, LLC, discriminated against Tejada on the basis of sex.[2]  (Doc. 51 at 15)  Next, Count IV asserts that the defendants violated the Florida Whistleblower Act by terminating Tejada's employment in retaliation to Tejada's refusal to participate in unlawful conduct. (Doc. 51 at 20)

Count V alleges that Boutros assaulted Tejada by "threatening to inflict injury, specifically sexual battery," on Tejada.  (Doc. 51 at 21)  And Count VI alleges that the defendants violated a Pinellas County ordinance by failing to pay Tejada's wages.  Count VII alleges that each defendant violated Section 83.44, Florida Statutes, by breaching the duty of good faith in performing and enforcing the rental agreement.  And finally, citing Boutros's conduct during the employment episodes, Count VIII asserts a claim for intentional infliction of emotional distress.

---

[2] In Counts II and III, Tejada asserts that each defendant violated both the FLSA and Article X, Section 24, Constitution of the State of Florida, by failing to pay her any wage (much less the minimum wage) for her work. However, the defendants move to dismiss neither Count II nor Count III.

**DISCUSSION**

Moving to dismiss (Doc. 52) six counts for failure to state a claim, the defendants argue that Tejada alleges inconsistent facts and that Tejada's Fair Housing Act claim alleges conduct occurring after Tejada already vacated the apartment.  Tejada responds (Doc. 54) and argues that she alleges consistent facts and that each count states a claim.

*I. Count I: Tejada's Fair Housing Act Claim*

The defendants move to dismiss Count I, Tejada's claim under the Fair Housing Act.  The defendants argue that "Count I makes legally insufficient conclusory allegations that Boutros and RL Properties 'have discriminated against Plaintiff . . . by providing different conditions in the rental' and 'by making statements that indicate . . . discrimination based on sex.'"  (Doc. 52 at 5) (*quoting* Doc. 51 at 15–16)  In support, the defendants argue that the allegations fail to identify a discriminatory act that occurred during Tejada's tenancy and that interfered with her enjoyment of the rental.  According to the defendants, because Tejada voluntarily terminated and vacated her rental before the episode with Boutros occurred, Tejada's "enjoyment of her rental . . . could not have been impacted by purported discriminatory acts."  (Doc. 52 at 5)

In response, Tejada argues (Doc. 54) that the defendants cite no authority supporting the assertion that the timing of her vacating the rental precludes her claim.  Further, Tejada argues that under her lease agreement, her lease "expire[d] on the 31st of May 2020," and the episodes with Boutros occurred in March.

(Doc. 54 at 2)  Therefore, because the "defendants never attempted to end her tenancy by filing an eviction action" and because "Boutros specifically agreed to forego the filing of an eviction action if [Tejada] performed sexual favors for him," Tejada insists that her rights under the FHA still applied.

In her FHA claim, Tejada seeks equitable relief, compensatory damages, and punitive damages.  Because she alleges no facts establishing that the defendants still continue to discriminate against her, Tejada's "claims for equitable . . . relief [a]re moot."  *Philippeaux v. Apartment Inv. & Mgmt. Co.*, 598 F. App'x 640, 643 (11th Cir. 2015).  However, although on the facts alleged Tejada cannot establish an entitlement to equitable relief, Tejada states a claim for damages.

Section 3604(b) of the Fair Housing Act proscribes sex discrimination against someone "in the terms, condition, or privileges of sale or rental of a dwelling."  Section 3604(b) receives "generous construction," *Trafficante v. Metro. Life Ins. Co.*, 93 S. Ct. 364, 367 (1972), and courts in the Eleventh Circuit hold that discrimination" under Section 3604(b) includes sexual harassment.  *See, e.g.*, *Richards v. Bono*, 2005 WL 1065141, at *2 (M.D. Fla. 2005) (Hodges, J.) ("[S]exual harassment claims under the Fair Housing Act have been recognized by every court considering the issue[.]"); *Noah v. Assor*, 379 F. Supp. 3d 1284, 1288 (S.D. Fla. 2019) ("[S]exual-harassment based sex discrimination claims are actionable under the Fair Housing Act."); *Tagliaferri v. Winter Park Hous. Auth.*, 2011 WL 13175164, at *2 (M.D. Fla. 2011), *aff'd*, 486 F. App'x 771 (11th Cir. 2012) (discussing the viability of sexual harassment claims in the context of Section 3604(b)).

Sexual harassment occurs "when behavior towards the tenant (1) constitutes *quid pro quo* sexual harassment; or (2) creates a hostile housing environment." *Noah*, 379 F. Supp. 3d at 1290 (*citing* 24 C.F.R. § 100.600; *West v. DJ Mortg., LLC*, 164 F. Supp. 3d 1393, 1398–1400 (N.D. Ga. 2016)). *Quid pro quo* harassment comprises an unwelcome sexual request "where submission to the request or demand, either explicitly or implicitly, is made a condition related to . . . the terms, conditions, or privileges of the sale or rental." *Noah*, 379 F. Supp. 3d at 1290 (internal quotations omitted); *see also Bono*, 2005 WL at *5 (Hodges, J.) ("[W]here the terms and conditions of a rental . . . are conditioned upon compliance with the sexual demands of a landlord, . . . the landlord is liable for sex discrimination under § 3604(b).").

The amended complaint alleges, among other things, that Boutros exposed his genitals to Tejada, pressured Tejada to work without clothes, and persistently requested nude photographs. (Doc. 51 at 12–13)  Boutros's alleged conduct is aptly characterized as sexual harassment. *West*, 164 F. Supp. 3d at 1399 (denying the motion to dismiss a sexual harassment claim in light of allegations that the defendant initiated unwelcomed sexual advances and asked the plaintiff for sexual pictures); *Salisbury v. Hickman*, 974 F. Supp. 2d 1282, 1292 (E.D. Cal. 2013) (denying a motion for summary judgment on the plaintiff's sexual harassment claim because the defendant on several occasions accosted the plaintiff and explained to the plaintiff that he had "urges" for her).  Further, Tejada alleges that Boutros conditioned an eviction action on Tejada's willingness to perform a sexual act on him.  (Doc. 51 at 13)  These events occurred in the context of a landlord-tenant relationship, and

- 8 -

given the events' relation to Tejada's eviction and rent payment — and the events' occurring more than two months before her lease expired — Tejada pleads sufficient facts to state a claim for *quid pro quo* sexual harassment in violation of Section 3604(b). *Richards*, 2005 WL 1065141 at *5 (denying a motion to dismiss a *quid pro quo* sexual harassment claim because the defendant threatened to evict the plaintiff if the plaintiff refused his sexual demands); *Noah*, 379 F. Supp. 3d at 1290 (holding that the plaintiff "sufficiently allege[s] *quid pro quo* harassment" because the defendant conditioned the renewal of the plaintiff's lease on sexual favors).

Although the defendants argue that Tejada fails to identify a discriminatory act that occurred during Tejada's tenancy, a rental agreement contemplates "an ongoing relationship between the landlord and tenant in which the landlord typically retains various powers, such as the right to . . . evict a tenant." *Richards v. Bono*, 2005 WL 1065141, at *2 (M.D. Fla. 2005) (Hodges, J.). Tejada remained obligated to pay rent after February, and Boutros — amid a compromise about rent payment and in a manner that was anything but "isolated or trivial" — allegedly threatened to initiate an eviction action if Tejada refused to perform oral sex on him. (Doc. 51 at 13) Thus, the events occurring after Tejada's vacating the rental nonetheless "related to . . . the terms, conditions, or privileges" of her rental. Tejada sustains a claim under the Fair Housing Act (although not a claim for equitable relief).[3]

---

[3] Because Tejada states a claim under Section 3604(b), this analysis includes no sustained treatment of Section 3617 of the Fair Housing Act.

## II. *Count IV: Tejada's Florida Whistleblower Act Claim*

Next, the defendants move to dismiss Tejada's claim under the Florida

Whistleblower Act (FWA).  The defendants argue (1) that Tejada fails to successfully

allege that any defendant satisfies the statutory definition of an "employer" and

(2) that Tejada's "whistleblower claim is directly contrary to other factual

allegations" in the amended complaint.  (Doc. 52 at 6)  According to the defendants,

the doctrine of repugnancy commends dismissing Tejada's FWA claim because "if

[Tejada] 'did not return' to work because she was allegedly in fear for her physical

safety, she cannot claim her employment was terminated for blowing the whistle."

(Doc. 52 at 7)

Tejada responds that she "properly alleged that the relevant defendants are

'employers' within the meaning of the FWA" and, in support, she cites portions of

the amended complaint that include allegations that the defendants constitute

"employers."  (Doc. 54 at 3)  Also, Tejada disputes that her claims are inconsistent.

That is, Tejada argues that "[i]t is completely consistent that someone may both

refuse to work for fear of their physical safety and be fired for retaliation."  (Doc. 54

at 14)

Section 448.101(3), Florida Statutes, defines an "employer" as "any

private individual, firm, partnership, institution, corporation, or association that

employs ten of more persons."  Not only does Tejada allege that each defendant "is

a covered employer as defined by . . . the Florida Whistleblower Act," but she also

observes that the defendants "employed [her] within the meaning of the Florida

Whistleblower Act."  (Doc. 51 at 2–8, 20)  Interpreted in the light most favorable to Tejada, "at this stage of the litigation," Tejada successfully alleges that the defendants are "employers" within the meaning of the FWA.  *Hyskaj v. New York New York Pizza, LLC*, 2018 WL 7458261, at *4 (M.D. Fla. 2018) (holding that the plaintiff's FWA claim "survives dismissal" because the complaint "includes an allegation, albeit conclusory, that 'Defendants are an employer within the meaning of the FWA.' . . .  [which,] at this stage of the litigation, the Court accepts . . . as true").

Regarding the inconsistency of Tejada's FWA allegations, Tejada alleges that "Boutros promised to have [Tejada] back to work on Monday, if she provided him with oral sex."  (Doc. 51 at 13)  Immediately after this allegation about the defendants' conditional willingness to allow Tejada to return to work, Tejada alleges that she "did not return to Defendants' office because she was emotionally distraught and feared for her physical safety."  (Doc. 51 at 13)  Despite this latter allegation about Tejada's emotional state, which might suggest a unilateral decision to end her employment, Tejada alleges that she "was fired in retaliation for this objection and refusal."  (Doc. 51 at 20)  The defendants argue that these allegations contradict each other and that Tejada cannot reasonably assert both to sustain an FWA claim.  Thus, the parties dispute whether Tejada coherently alleges that the defendants terminated Tejada because of her opposition to Boutros.

Tejada's allegation that she refused out of fear to return to work is consistent with the allegation that the defendants terminated her because she refused to

participate in unlawful conduct.  Claims under the FWA and Title VII receive the

same analysis, *Chaudhry v. Adventist Health Sys. Sunbelt, Inc.*, 305 So. 3d 809, 816

(5th DCA 2020), so to succeed on her FWA claim, Tejada must establish that

"(1) she engaged in statutorily protected activity, (2) an adverse employment action

occurred, and (3) the adverse action was causally related to [Tejada]'s protected

activities." *Gregory v. Georgia Dep't of Human Res.*, 355 F.3d 1277, 1279 (11th Cir.

2004) (*quoting Little v. United Technologies, Carrier Transicold Div.,* 103 F.3d 956, 959

(11th Cir. 1997)).

Tejada alleges engaging in statutorily protected activity because she "opposed

. . . an unlawful employment practice."[4]  42 U.S.C. § 2000e–3(a).  Further, according

to Tejada's allegations, the defendants expressly conditioned Tejada's employment

on her consenting to unlawful conduct, the exchange of money for sexual acts.  That

is, implicit in Boutros's threat and conditional offer — to allow Tejada to return to

---

[4] Section 704(a) prohibits an employer's discriminating against an employee for a retaliatory purpose and contains two different clauses that protect two similar (but distinct) types of activity. The "participation clause" in Section 704(a) protects an employee who "participated in any manner in an investigation, proceeding, or hearing"; the "opposition clause," on the other hand, extends protection to an employee who "has opposed any practice made an unlawful employment practice." 42 U.S.C. § 2000e–3(a). Thus, because Tejada participated in no investigation (or the like), the "opposition clause," which provides broader protection, is applicable to Tejada's conduct.

Complaining about, and refusing to comply with, an employer's unlawful conduct constitutes "protected activity" within the meaning of the opposition clause. *See, e.g., Valentin-Almeyda v. Municipality of Aguadilla*, 447 F.3d 85, 94 (1st Cir. 2006) (explaining that under the opposition clause, "protected conduct includes . . . complaining to one's supervisors"). Further, although the Eleventh Circuit has yet to address the subject, some circuit courts of appeals hold that rejecting a supervisor's sexual advances constitutes "protected activity." *Ogden v. Wax Works, Inc.*, 214 F.3d 999, 1007 (8th Cir. 2000) (concluding that the plaintiff's refusal of her supervisor's sexual advances constituted the most "basic form of protected activity"). And district courts in the Eleventh Circuit agree. *See, e.g., Charest v. Sunny-Aakash, LLC*, 2017 WL 4169701, at *7 (M.D. Fla. 2017) ("A reasonable jury could find that Plaintiffs' refusal to engage in further sexual acts with Panjabi constituted protected activity."). Thus, although the parties sparsely address the issue, Tejada alleges "engaging in statutorily protected activity."

- 12 -

work and avoid an eviction action only "if she provided him with oral sex" — was a parallel promise to terminate Tejada if she refused to provide him with oral sex. Thus, when Tejada refused to consent to Boutros's solicitation by refusing to return to the office, Tejada could have both refrained from "return[ing] to [the d]efendants' office because she . . . feared for her physical safety" and experienced an "adverse employment action" because she "[o]bjected to, or refused to participate in, any activity . . . in violation of a law." Section 558.102, Florida Statutes. In this sense, according to her allegations, Tejada's refusal of Boutros's sexual advances "was causally related" to an "adverse employment action," her termination.[5] *Ogden v. Wax Works, Inc.*, 214 F.3d 999, 1007 (8th Cir. 2000) (holding that the refusal of a supervisor's sexual advances constitutes the most "basic form of protected activity"). Therefore, as alleged, Tejada states a claim under the FWA.

### III. Count V: Tejada's Assault Claim

Next, the defendants move to dismiss Tejada's assault claim. Although the defendants acknowledge that "the allegations in Count V assert that Boutros verbally threatened Plaintiff with sexual battery," the defendants argue that Count V fails to include an allegation that Boutros performed any action "in furtherance of the alleged threat." (Doc. 52 at 7) Further, the defendants observe that "the alleged

---

[5] Further, assuming the truth of the amended complaint, the defendants furnished Tejada with objectively intolerable working conditions and, consequently, constructively discharged her. *Pennsylvania State Police v. Suders*, 542 U.S. 129, 141 (2004) (holding that constructive discharge occurs if an employee provides "working conditions . . . so intolerable that a reasonable person in the employee's position would have felt compelled to resign"). And Title VII (and, consequently, the FWA) prohibits retaliation against former and current employees. *Robinson v. Shell Oil Co.*, 519 U.S. 337, 345–46 (1997).

threat . . . is based on Boutros's text messages alone, not a face-to-face conversation." (Doc. 52 at 7)

Tejada responds by distinguishing criminal assault from tortious assault, two different forms of liability that she asserts the defendants confuse.  And Tejada argues that she alleges facts supporting the elements of a tortious assault.  Tejada's support for the assault is traced to her allegations (1) that Boutros exposed himself to Tejada when she arrived to work, (2) that Boutros "told her to take off her clothes," (3) that Boutros "pressured her" and "coerced her" to disrobe after she initially refused, (4) that Boutros requested oral sex, and (5) that Boutros accompanied these acts with the "threat of . . . forcing [Tejada] to perform oral sex."  (Doc. 54 at 5)  According to Tejada, these acts demonstrate both action "in furtherance of the alleged threat" and Boutros's ability to actualize the threatened assault.  (Doc. 54 at 6)

Tejada states a claim for assault.  Tejada's amended complaint includes allegations that after Tejada arrived at work the first day, a naked Boutros "immediately requested Plaintiff, whose only reason for working in Boutros' office was to pay her debt . . . , to disrobe."  (Doc. 51 at 11)  After she refused, Tejada alleges, "Boutros continued to coerce her."  (Doc. 51 at 11)  Further, Tejada alleges that Boutros requested oral sex "in extremely graphic terms." (Doc. 51 at 12)  And in conjunction with these allegations, Tejada alleges that Boutros "threaten[ed] to inflict injury, specifically sexual battery," on Tejada. (Doc. 51 at 21)

Tejada sufficiently alleges that Boutros's conduct constitutes in total an "intentional, unlawful offer of corporeal injury to another by force. . . under such circumstances as to create a well-founded fear of imminent peril, coupled with the apparent present ability to effectuate the attempt if not prevented." *Medina v. United Christian Evangelistic Ass'n*, 2009 WL 653857, at *2 (S.D. Fla. 2009) (*quoting Winn & Lovett Grocery Co. v. Archer*, 171 So. 214, 217 (Fla. 1936)). Although "mere words alone are not sufficient to constitute assault where they are unaccompanied by any menacing action or attitude and . . . do not put the person toward whom they are directed in fear," Tejada alleges facts supporting Boutros's "menacing" action and attitude, and she amply describes her subsequent fear. *Medina*, 2009 WL at *2. Tejada adequately states a claim for assault.

### IV. Count VI: Tejada's Wage Theft Claim

The defendants argue that Tejada's claim under Pinellas County's Wage Theft Ordinance warrants dismissal because she failed to exhaust her administrative remedy. The defendants describe the ordinance's administrative procedure and assert Tejada's failure to "follow[ ] the mandatory procedural requirements." (Doc. 52 at 8) Also, the defendants argue that the FLSA and FMWA preempt the wage theft claim.

Tejada argues (1) that neither the FLSA nor the FMWA preempts her right to recover under the ordinance; (2) that the portion of the ordinance cited by the defendants is inapplicable to "cases brought by an individual"; (3) that the ordinance "does not include an[ ] exhaustion requirement" and "provides several rights and

- 15 -

remedies that the[ ] statutes do not provide"; (4) that the authority cited by the defendants is inapposite; and (5) that supplemental jurisdiction over the wage theft claim is proper in this instance.  (Doc. 54 at 6–9)

A plain reading of the ordinance reveals that Pinellas County's Wage Theft Ordinance contemplates enforcement of the ordinance exclusively by a "special magistrate," in a "quasi-judicial hearing," and in accord with the procedure specified in the ordinance.  *See* Pinellas County Wage Theft Ordinance, §§ 70-307–308 (discussing the procedure and enforcement mechanism for a wage-theft complaint). And, under the "enforcement by private action" section of the ordinance, if a claimant "brings a private action in their own right . . . in any state or federal court . . . based upon the same or substantially the same facts and allegations as the employee's complaint to the PCOHR," the employee's complaint of wage theft "will be dismissed with prejudice."  In sum, the ordinance offers an elective administrative alternative to an action in court, an alternative that a complainant may pursue or not.  But the ordinance provides that the rights, procedures, and remedies of the ordinance will yield by dismissal with prejudice, a dismissal that bars any claim under the ordinance, if the complainant files a civil action in court — without the need to complete or "exhaust" the ordinance's process.  Because in this action Tejada exercises under federal and state law a private right of action, her wage theft

claim under the ordinance, which was abandoned by her filing this action, warrants dismissal.[6]

### V. Count VII: Tejada's Claim for Breach of the Statutory Duty of Good Faith

Tejada alleges that the defendants breached the duty of good faith imposed by Section 83.44, Florida Statutes, which governs landlord-tenant relationships.  The defendants move to dismiss this claim (1) because the lease agreement includes as a party one defendant only and (2) because "Count VII fails to state a claim against the remaining defendants that are not parties to the lease."  (Doc. 52 at 9)  Also, the defendants argue that the amended complaint identifies no "action taken to enforce the rental agreement."  (Doc. 52 at 9)  Tejada responds that discovery should "proceed to determine the relationship between all of the defendants and RAB Land Properties, the specific defendant listed on the lease."  (Doc. 54 at 10)  Regarding the "action taken to enforce the rental agreement," Tejada argues that the amended complaint includes several descriptions of Boutros's effort to enforce the lease and cites in support examples from the amended complaint.

Tejada states a claim under Section 83.44, Florida Statutes.  First, although RAB Land Properties, LLC, is the only defendant that was a party to the lease

---

[6] Tejada emphasizes the ordinance's unusual provision that "entitle[s] an employee, upon a finding by a special magistrate appointed by the County or by a court of competent jurisdiction" to an award of "up to" three-times the unpaid back wages. (Doc. 54 at 8) However, this provision, at most and if applicable and if not preempted or abandoned or barred, purports to create a special measure of damages recoverable for wages unpaid in Pinellas County even if the damages are recovered in a claim not based on the ordinance. Deciding the precise scope of the ordinance's treble damages remedy, that is, deciding the proper measure of damages, is unnecessary in resolving a motion to dismiss for failure to state a claim.

agreement, Tejada alleges that the "corporate defendants' operations are so intertwined . . . that they act as a single entity." (Doc. 51 at 8)  Under this theory of agency, liability might attach to each defendant depending on the facts revealed by discovery.  Second, Section 83.44, Florida Statutes, applies to "every rental agreement or duty within this part," including non-contractual duties.  In other words, the law might have prescribed the defendants' duties to Tejada notwithstanding the defendants' absence from the lease agreement.  Thus, each remaining defendant's status as a "non-party" to the contract fails to preclude Tejada's claim.

As to Boutros, Tejada observes that the amended complaint includes several instances in which Boutros allegedly performed "bad faith" actions aimed at enforcing the lease agreement.  (Doc. 51 at 12) (alleging that Boutros threatened Tejada with "default" and "eviction" if she refused his request for oral sex).  And Tejada alleges that "Boutros is a principal and an agent of all the Corporate Defendants." (Doc. 51 at 8)  At this stage, Tejada states a claim under Section 83.44, Florida Statutes.

*VI. Count VIII: Tejada's IIED Claim*

Finally, the defendants move to dismiss Tejada's claim for intentional infliction of emotional distress.  The defendants acknowledge Tejada's allegations that Boutros (1) demanded that "Conny Tejada work in the nude in an office building" and (2) "attempt[ed] to coerce . . . Tejada into putting Defendant Boutros' penis in her mouth." (Doc. 52 at 9)  Nonetheless, citing authority dismissing IIED

claims based on salacious allegations, the defendants argue that the "purported IIED claim is subject to dismissal because the allegations do not reach the necessary level of outrageousness required to sustain an IIED claim." (Doc. 52 at 9) Opposing dismissal, Tejada insists that the balance of her allegations demonstrates that Boutros's conduct was "outrageous." To support, Tejada lists eight allegations that display Boutros's "outrageous" behavior, and Tejada cites authority permitting claims of "nearly identical lascivious and outrageous behavior" to continue. (Doc. 54 at 12)

To state a claim for intentional infliction of emotional distress under Florida law, Tejada must allege that the defendants' deliberate, objectively "outrageous" conduct caused her severe mental suffering. *Yule v. Ocean Reef Cmty. Ass'n*, 2020 WL 3051505, at *5–6 (S.D. Fla. 2020); *Golden v. Complete Holdings, Inc.*, 818 F. Supp. 1495, 1499 (M.D. Fla. 1993); *Medina v. United Christian Evangelistic Ass'n*, 2009 WL 653857, at *4 (S.D. Fla. 2009). But Florida law's standard for what constitutes "outrageous" conduct is exceedingly high. *Merrick v. Radisson Hotels Int'l, Inc.*, 2007 WL 1576361, at *4 (M.D. Fla. 2007). As the Florida Supreme Court explains in *Metro. Life Ins. Co. v. McCarson*, 467 So. 2d 277, 278–79 (Fla. 1985), "Liability has been found only where the conduct has been so outrageous in character . . . as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Yet, even though Florida courts have remained reluctant to allow IIED claims in sexual harassment cases, "[t]he viability of a claim for intentional infliction of emotional distress is highly fact-dependent, and

turns on the sum of the allegations in the specific case at bar." *Medina*, 2009 WL at *4 (*quoting Vernon v. Med. Mgmt. Assoc. of Margate, Inc.*, 912 F. Supp. 1549, 1558 (S.D. Fla. 1996)).

The facts alleged in the "specific case at bar," and interpreted in the light most favorable to Tejada, sufficiently allege an IIED claim.  The amended complaint includes allegations (1) that Boutros threatened Tejada with "sexual battery" and eviction if she refused to perform oral sex on him; (2) that Boutros commanded Tejada to disrobe over her objections; (3) that Boutros "filmed [Tejada]" without her consent "as she worked" naked; (4) that Boutros exposed his genitalia to Tejada; (5) that Boutros requested oral sex from Tejada despite his "history [of] expos[ing] himself to sexual disease"; and (5) that Boutros committed other atrocious acts in an effort to exploit Tejada.  *Salisbury v. Hickman*, 974 F. Supp. 2d 1282, 1293 (E.D. Cal. 2013) ("[S]exual harassment by someone in a position of authority is more likely to be emotionally and psychologically threatening.").

In light of Boutros's relation to Tejada as her landlord-employer, in light of the "graphic" nature of Boutros's solicitations, and in light of the defendants' challenge at the "motion to dismiss stage," *Vernon v. Med. Mgmt. Assocs. of Margate, Inc.*, 912 F. Supp. 1549, 1560 (S.D. Fla. 1996), Boutros's conduct could reasonably cause a reasonable and informed "member of the community . . . to exclaim, 'Outrageous!'" *McCarson*, 467 So. 2d at 279 (*quoting* Restatement (Second) of Torts § 46 (1965)).  Further, Tejada claims that Boutros's conduct caused her to "suffer[ ] extreme emotional trauma."  (Doc. 51 at 24)  Tejada states a claim for IIED.

- 20 -

**CONCLUSION**

Only one claim warrants dismissal.  Accordingly, the defendants' motion (Doc. 52) to dismiss is **GRANTED-IN-PART** and **DENIED-IN-PART**.  Tejada's Wage Theft claim (Count VI) is **DISMISSED**.[7]  As to each other claim, the defendants' motion to dismiss is **DENIED**.

ORDERED in Tampa, Florida, on February 4, 2021.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE

---

[7] Also, even though Tejada includes both the claim for equitable relief and the claim for damages in the same count, Tejada fails to state a claim for equitable relief in Count I.